And we will take Bisker v. GGS. Mr. Corsack. Good morning, Your Honors. Good morning. May it please the Court, my name is Joseph Corsack. I'm representing Jamie Bisker, who is the plaintiff appellant in this case. I've reserved five minutes for rebuttal, Your Honor. That's fine. I'm sorry, you wrote the letter, Mr. Corsack? Yes, sir. Yeah, I should tell you that it was very nice of you. It was very nice. But we'll give everybody whatever they ask for as rebuttal. I understand. If you come again, you'll know. I understand. Thank you. Thank you for the courtesy. This case is, at its heart, a failure-to-accommodate situation. And for purposes of the appeal, I believe that the appellees have conceded the existence of the disability. I think the evidence below was clear that the employer ---- She has multiple sclerosis. Yes, ma'am. And that the employer had known of the disability for at least two or three years. And the case seemed to turn on the issue of whether or not she could perform the essential functions of her job. Just factually, is she now receiving both short-term disability and long-term disability? Yes, she is. She's receiving both? Yes. Oh, no, no, I'm sorry. No, no. The short-term would run out and then the long-term would kick in. Okay. So she's now receiving long-term. That's right. That's right. Along with Social Security benefits as well. All right. And has her condition continued to ---- I didn't hear you, Your Honor. Has her condition continued to deteriorate? We talked about that on the way down. She's just about steady where she's been for the last two years. Okay. Okay. And in reference to the issue of the essential functions of the position, I wanted to make clear to the Court from the record that those that worked with Jamie knew and understood that her job functions didn't change at all. There was a Patrick Carlton who worked with her and who left the company in August of 2007, and he testified at his deposition that in the year following her no longer being able to technically work in the workplace, that so far as he knew there had been no change in her job, no change in the requirements. The employer took great pains throughout the proceeding to try to explain that there were changes. One, for instance, suggesting that this employee needed to be working in the workplace in order to communicate with her coworkers. But at the same time, they acknowledged that she could do so by telephone. Let me ask you something there. I'm sorry. Go ahead. I don't hear. I understand that your main argument, of course, is that the District Court got the Cleveland case dead wrong. But setting that aside for just a minute, your opponent argues that even if the District Court saw Cleveland the way you see it, that your client was not an otherwise qualified individual because the character of the job itself had changed, and she had to be in the office to interact with people. And therefore, the accommodation she sought, it was impossible, and she wasn't otherwise qualified. What's your response to that? Actually, let me just add to that. She had to be in the office for 40 hours during a five-day week, and she said that she could only work from home 40 hours during a seven-day week from home. Well, the point was that she was able to do this work because of the Internet connection. But I think the point that may be overlooked here is the fact that the employer's own testimony was that the conditions of her job and her responsibilities did not change up until August of 2007. Now, their HR person, who only came with the firm in June or July of 2006, three months after she had worked her last day, came in and testified that, oh, we've got all these new changes, and she's got to interact, da-da-da-da-da-da. But when we spoke with Mr. Carlton and his deposition, he acknowledged that, from his point of view, there hadn't been any change in her job. In fact, the job description that's set forth in the appendix was the same one since it had been created in the year 2000. So at least you're saying there's an issue of fact as to whether or not she was otherwise qualified. Absolutely. There's no question about that. And I think that this is one of these cases that is so unusual from my experience practicing in the labor law area. It was something of a target-rich environment when it came to direct evidence of discrimination. We have an e-mail that's part of the record where the company president told his HR person to find a reason why she could not do her job. Is that what you mean? The one I'm familiar with is when the employee talked with someone from the MS Society, reported back, and he said, Then don't talk to them. Then we'll keep them out of it. But that's the only thing I found that Coker said. Did he say something else? Well, Coker then, I mean, when it comes to the issue of credibility, Coker then testified that I asked him, Who was the affirmative action officer for the company? And he says, I don't know. Well, the affirmative action plan said that he was. I mean, this company's lack of devotion to the issue of commitment to the disabled was alarming at best. How big is the company? A couple hundred employees. They're all over the world. But they made absolutely no effort to try to accommodate her. And even, keep in mind, the reason why the issue of accommodation came to the floor was that my client was approached by Mr. Carlton, her supervisor, and says, I want to see if I can work at home doing what you were doing. So he went home, he took a test, he brought a laptop along, did all the work to satisfy himself that it was doable. He reports it to Mr. Frazier. Mr. Frazier reports it to Mr. Kilker, the president. Kilker says, well, we'll put it on the back burner. Well, isn't the real question we have to decide whether the requirements of the ADA are the same requirements as those to receive social security disability benefits? Isn't that what the problem is? Now, under the ADA, the employer has to make an accommodation. But isn't it so that to get social security disability benefits, there's no requirement on the employer to make an accommodation? So they're not really the same, are they? Well, I don't think that that is the rule, Your Honor. Really? I think the Supreme Court recently spoke to this issue of judicial estoppel. In Cleveland, that's what. Well, but the most recent one was in June, a decision by Mr. Justice. I interpret that question as a softball. By Mr. Justice Alito that highlighted it. Not by Justice Alito, but Justice Loeb. That explained. We can chat with him. Yeah, that explained the whole notion of what has to be proven. And it's our position. Which case are you referring to? It's the Zedner case, Your Honor. Zedner versus the United States. It was decided on June 5th. I'm sorry, it's June 5th of 06. Not just recently. Yeah, not recently. That's right. That's right. But I think it's clear if you evaluate the three criteria for judicial estoppel and you compare it with what the trial judge did below, he didn't go through that exercise. He didn't do it at all. He seemed to adopt the per se rule that if you did apply for Social Security, if you did apply for long-term disability benefits, that that would automatically preclude you from being able to carry forward with an ADA action. But she didn't tell the Social Security people that she had to work at home. Here's what happened. Your Honor, first she applied and she was rejected. She then went through the application phase. She applied for disability benefits. That's right. Then she files a reapplication. At that point she's getting prepared to present testimony at a hearing before an administrative law judge and Social Security changed their mind and decided that she was eligible for benefits. And it was at that point that she was intending to go in there and explain, as she had to, everyone who would listen to her, that she was ready, willing, and able to work at home. And I think that's the point of this case is that the physician that worked with her, Dr. Ray Grant from the Lehigh Valley Hospital Center, I will admit had some grave things to talk about her medical condition. There's no question about that. But in every letter that he wrote to this employer, every single one, he substantiated the fact that she was able to work at home. And, I mean, ultimately that's the purpose of the ADA, is to make sure we're not warehousing people, making sure that people that do have the ability to work can do so. Sure, but, of course, it's not his call. It's the employer's call as to whether or not that is an accommodation that is reasonable and that they can actually do the job from home, right? I'm saying, but, Your Honor, that kind of gets us further than we should be because as of May 5th, with Kilker telling Ms. Stamen, well, then don't talk to this animal. The decision was made at that point. I'm not addressing the factual assertion that they wouldn't have allowed her anyway. I understand your factual point. But as a matter of law, the fact that the doctor says she can work from home, that doesn't answer the question for us, right? It only lays a factual foundation that she could do that. And then there's an additional question, which is, is that a reasonable accommodation for the job that has certain essential functions? Right, but there was other evidence of that, Your Honor, and we had testimony that the cost of setting her up with the computer at home, installing a firewall, giving her a modem, was going to be a couple hundred dollars. In an application for disability benefits, don't you have to say, didn't she say that she was unable to work? You have to establish, as I understand it, Your Honor, that you're incapable of substantial gainful employment. Okay. Now, why isn't that inconsistent with her claim under the ADA? Because in her view, she could do work at home, which would not necessarily, you know, to a layperson going in and making an application for this, I don't think anyone would have decided that they were going to walk away from it because it might… As I understand your point, it's almost like what you said at the beginning. This is a case about an accommodation that wasn't really addressed. Exactly. Well, let's hear from the employer. Thank you, Your Honor. Mr. Candiello. May it please the Court. My name is Vincent Candiello, and I represent GGS, the defendant in this case. Mr. Candiello, I mean, you might want to just start where we left off. Isn't this case about a request for an accommodation that has yet to be addressed and certainly hasn't had a complete interactive process? No, I disagree with that. I believe that the issue that was presented by the lawsuit was an issue of accommodation. I believe that on appeal the issue is accommodation, but I don't agree that it wasn't fully and completely addressed. Isn't the real issue before us, Mr. Candiello, whether the district court completely shanked the question of how Cleveland applies here? No, I… Using shank in a different sense. As opposed to my golf swing. I certainly wouldn't give it that pejorative, Your Honor. As opposed to our prisoner in Polk. But from our perspective, I think that the answer really is this is truly a factual case that was not in dispute. Well, stop and answer this for me. Sure. Do you agree or disagree that the Cleveland case and our own precedent in Turner v. Hershey-Chocolate says there is not an inherent inconsistency between saying I'm disabled for purposes of applying for Social Security disability benefits or long-term or short-term disability and also saying under the ADA I can still work if you'll make an accommodation? Do you agree that that's what Cleveland and Turner say? Yes. Okay. I agree with that. And isn't it the case that the district court here looked at Cleveland and said, well, she said she was disabled when she went and got her Social Security disability benefits and long-term and short-term disability. Therefore, she's judicially stopped from even asking for an accommodation under the ADA. Isn't that what the district court did? I think the court's decision, the district court's decision was far deeper than that because of the evidence placed before it. Well, with the district court, let me just quote you the language. In Cleveland, the Supreme Court held that a person who has successfully obtained SSDI benefits can be stopped from pursuing an ADA claim because of the apparent conflict between the two claims. That's not what the Supreme Court said. The Supreme Court said that the two things, just as Judge Jordan said, the Supreme Court said that these two things, SSDI and an ADA claim, can exist comfortably side by side. I agree that that's the law, Your Honor. And what the court said here and then goes on saying basically a successful SSDI claim carries with it a finding that the person cannot engage in any kind of substantial work, not just her previous job, but an ADA claim asserts that she can perform the essential functions of her job with or without reasonable accommodation. Now, he then goes on and says estoppel's not automatic, but in effect he's saying that there is judicial estoppel here. She said she can't work. Therefore, she can't say she can work. But in getting, I'm sorry to interrupt. No, that's okay. I'm sorry. No, go ahead. In getting to that conclusion, the court considered the facts we presented, which were not in dispute about her ability to work. And the court went into that in its decision to show that it considered the statement she made together with her physician. And those statements, including for her FMLA application that stopped her from working, that she could not perform work of any kind for a year, that was her physician's statement. Let's assume you're right. But by virtue of misstating what Cleveland holds, shouldn't we remand and allow the judge another opportunity to take a look at this? That is certainly an option for you to clarify the legal analysis it made in this case. But I think if we look at it in context of the fact that we have a circumstance where the individual and her treating physician say repeatedly for not only, and actually at first FMLA, then STD, then LTD, statements that she cannot even perform sedentary work. Isn't there also simultaneously with that a series of communications in which the statement is made, in effect, I could do this if I were at home? I could work at home. If you let me work from home, I could do this. There has certainly been, Judge Jordan, throughout this case, an interest on the part of the plaintiff to do work of some kind. And it was clear as well from the investigation of the employer its perplexion of dealing with a situation where her physician is saying she can't do work of any kind and her saying, I want to work from home. Isn't the implication at least, if not, I think one might reasonably argue, the explicit holding of Cleveland that you can't be accused of speaking with a forked tongue because you say on the one hand, for disability purposes, I can't work, and then on the other hand say that for ADA purposes, I can work with an accommodation because those things are not mutually inconsistent. I agree with what you're saying from the legal analysis, and I don't dispute that. So if that's the case, why, how could we not send it back? Well, because of the facts that were presented at summary judgment, which shows clearly, contrary to what my opponent says, that the job clearly had changed. Now, don't you read Cleveland to say that, in the specific languages, does not automatically stop the participant from pursuing an ADA claim? But on the other hand, there are certain senses in which it would. Correct. And as this Court said in Debts, it's a factual consideration, not a legal conclusion that you compare. And the facts in this case show that a job that she had performed for several years had completely transformed in the period of time when she stopped working. Tell us how important the time, the number of days that she could work was to the employer. This question of five days versus seven days. Yeah, let me explain the difficulty the employer had in this transition process. Her work, the work of this employer, is to create parts manuals. And they do it for trucks. They do it for homeland security, for tanks, for all kinds of vehicles and aircraft and a variety of things. And the problem is, is that when this work transferred from York, Pennsylvania, to India, there are several things that were found by GGS. And one of those is, is that the people that were formerly in York, which included the plaintiff, parts listing, they became people involved in quality assurance. So they no longer were creating the parts listing. They were checking the work of others. The other problem with that meant the district court didn't get into any of this, did it? But you were asking me about what was presented. We presented this to the court. These facts were before the court. But it's not, it doesn't show up in the court's analysis at all, does it? I mean, as far as we know, the only thing the court was looking at is judicial estoppel, right? In fact, the court says that. And the court said, recounted the facts of what this person could do and clearly compared it to what the work was, even though it was not detailed. But the fact is, is that this person said, I couldn't do work of any kind. I couldn't work for any, I couldn't guarantee I could work any day. I couldn't guarantee that I could work even an hour in a particular day. What I wanted to do, in light of her physician's statement, that she couldn't perform the essential functions of the job that were described to the doctor by the HR Department, which included a physical skills assessment that was created by Rick Lewis, her immediate supervisor, and the declaration given to the court by Rick Lewis indicated he passed that around all the other parts solicitors at the time, they were all in agreement, and that required that they be together during the shift. But to do that, what you're talking about is, can she perform the job, is can she perform it with an accommodation? And what the court says here, I mean, Judge Jordan is absolutely right. The court says, we conclude, based on plaintiff's inability to offer sufficient explanations for the and a receipt of disability benefits under the SSDI, that she is barred by judicial estoppel from pursuing her ADA and PHRA claims. Then it goes on, our conclusion makes consideration of plaintiff's contentions concerning possible accommodations moot. The ADA is all about accommodations, and he didn't address it. So should we not give him another opportunity to address it? Again, that is an option, but I don't think that's necessary, because of what was before the court at the time, which is part of the court record, which detailed very- We would have to make this, we would have to, you're suggesting that we, in the first instance, should make judgments about the factual record, which the district court declined to make. Express like this. Well, factual judgments, in fact. The court was making a judgment that you have recited, that the demonstration of an inability to work of any kind, even though she was saying, yes, I can do something. I can't tell you what it is, but I can do something. And so, therefore, I want to do work without any supervision, without any interaction with coworkers, without any of this stuff. Answer this, if you would, please. Okay. You are, are you not, asking us to make factual judgments about the record, which the district court expressly declined to make? Well, I think the sister court did draw conclusions and find as facts about her condition. That there was a- Judge Ambrose just read you the language. Well, I read the conclusions drawn, but what I'm saying is, is that in the beginning of that decision, the court recited circumstances regarding the plaintiff's condition. And those statements of fact by her and her physician indicated she could not perform work of any kind. And then the doctor, after saying she couldn't perform the essential functions of her job, said, but why don't you ask her to do, why don't you give her some work, some work of some kind that she might be able to do in 40 hours in a seven-day period? I think, I think we've heard you. Thank you so much. Thank you very much. Did you want to use your rebuttal time? Yes. You did. Okay. You sure about that? Yes, I, but just for a very limited purpose. And that is to emphasize that this was a two-part appeal. We appealed the grant against us of summary judgment in favor of the defendant. We also appealed the denial of the grant. Oh, yeah, well, that's ordinarily not appealable. Well, all right. Well, but I think the point is, is that we had more than sufficient evidence under either McDonnell-Douglas criteria or Price Voter House to establish all of the requisite elements to entitle us to summary judgment. You don't think there's any material issue of fact as to whether or not your client could perform with the accommodation she asked for? No. And the thing is, the thing is, is that, again, I'm looking to May 5th as being a key point in this because it was as of that date that Kilker made clear that this company, under no circumstances, was going to do anything for an MS employee. Thank you, Your Honors. Thank you. The next case will be an hour. We've given an hour, so we'll take a five-minute recess.